UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA,

    -against-

JOSEPH NEUMANN,

               Defendant.

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: _08/17/2022__

No. 21 Cr. 439 (NSR)
OPINION & ORDER

NELSON S. ROMÁN, United States District Judge:

    The Government charged Defendant Joseph Neumann with a five-count indictment for aiding and assisting in the preparation of false and fraudulent U.S. individual tax returns, in violation of 26 U.S.C. § 7206(2), for failure to file tax returns, in violation of 26 U.S.C. § 7203, and for conspiracy to operate an unlicensed money transmitting business (an offense under 18 U.S.C. § 1960), in violation of 18 U.S.C. § 371. (Indictment, ECF No. 1.)

    Presently before the Court is Defendant's motion seeking to (1) dismiss Count Five of the Indictment; (2) suppress evidence recovered from consensual recordings by a Cooperating Witness ("CW") and wiretaps; (3) sever Counts One through Four from Count Five; (4) compel the Government to produce certain discovery materials; and (5) compel the Government to produce any recordings, transcripts, and translations that it intends to use at trial 90 days before its commencement. (ECF No. 33.) For the following reasons, the Court DENIES Defendant's motion in its entirety.

## BACKGROUND

    On July 6, 2021, a Grand Jury sitting in this District returned a five-count indictment against Defendant based on the Government's allegations that he participated in two interconnected schemes to defraud the Internal Revenue Service ("IRS") of taxes from 2014 to 2018. (Indictment, ECF No. 1.)

The Government first charges Defendant with two counts of aiding and assisting in the preparation of false and fraudulent individual income tax returns, in violation of 26 U.S.C. § 7206(2). (Indictment ¶¶ 1–3.) Specifically, the Government alleges that in the individual income tax returns he filed for 2015 and 2016, Defendant reported only a portion of the more than $2.5 million in payments he received from a pharmacy located in Rockland County, New York as income earned for consulting services. (*Id.* ¶ 2.) The Government claims Defendant willfully, knowingly, and frequently caused his tax return preparer to omit income he received on his 2015 and 2016 tax returns, substantially understating his total income as set forth below:

| COUNT | FILING DATE | TAX YEAR | UNREPORTED INCOME | TAX LOSS |
|-------|-------------|----------|-------------------|----------|
| ONE | 10/01/2016 | 2015 | $1,268,765 | $368,888 |
| TWO | 09/28/2017 | 2016 | $843,332 | $229,632 |

(*Id.* ¶ 3.)

The Government next charges Defendant with two counts for failure to file individual income tax returns for the years of 2017 and 2018 despite receiving a total of more than $1.7 million in income in those years, in violation of 26 U.S.C. § 7203. (*Id.* ¶¶ 4–6.) The Government alleges that Defendant knowingly and willfully failed to make returns and supply information, as required by law and regulations, as set forth below:

| COUNT | TAX YEAR | FILING DEADLINE | UNREPORTED INCOME | TAX LOSS |
|-------|----------|-----------------|-------------------|----------|
| THREE | 2017 | 04/17/2018 | $473,993 | $205,828 |
| FOURT | 2018 | 07/15/20202 | $1,045,575 | $441,694 |

(*Id.* ¶ 6.)

The Government lastly charges Defendant with one count of conspiracy to operate an unlicensed money transmitting business (an offense under 18 U.S.C. § 1960), in violation of 18 U.S.C. § 371. (*Id.* ¶¶ 7–10.) The Government alleges that from at least September 2014 to August 2016, Defendant knowingly and willfully conspired and agreed with others to transmit

approximately $6 million that he and others believed to be stolen, using real estate companies and charities under their control, which failed to comply with the money transmitting business registration requirements set forth in federal law and regulations. (*Id.* ¶¶ 8–9.)

Specifically, the Government claims that in July 2015, Defendant met with others at his residence in Monsey, New York and discussed an arrangement in which he would accept cash from a third party and then write a check payable to an entity designated by the third party, all in exchange for a fee of ten percent of the amount of cash. (*Id.* ¶ 10.) In accordance with that arrangement, on July 24, 2015, Defendant first accepted $15,031 in cash from the third party and gave that third party a check for approximately that same amount. On November 3, 2015, Defendant next accepted $165,280 in cash from the third party and gave that third party two checks in the total amount of $150,280, while retaining the difference of $15,000 as his fee for laundering the cash. On December 24, 2015, Defendant lastly accepted $247,500 in cash from the third party and gave that third party two checks in the total amount of $225,000 while retaining the difference of $22,500 as his fee for laundering the cash. (*Id.*)

On July 8, 2022, Defendant filed the instant motion (ECF No. 33), along with supporting exhibits (Bove Aff., ECF No. 35; Bove 2d Aff., ECF No. 36) and a memorandum in support ("Motion," ECF No. 34). The Government filed its opposition on July 29, 2022. ("Response in Opposition," ECF No. 39.) Defendant then filed a reply on August 12, 2022. ("Reply," ECF No. 40.)

## DISCUSSION

By his motion, Defendant asks the Court:

1. To dismiss the violation of 18 U.S.C. § 1960 charged in Count Five of the Indictment;

2. To suppress consensual recordings obtained during the investigation by a cooperating witness (the "CW") due to the failure to preserve exculpatory

evidence relating to entrapment and, in the alternative, for a hearing on this issue;

3. To suppress wiretap evidence based on a lack of probable cause and minimization failures, for a *Franks* hearing, and to dismiss Count Five based on a violation of 18 U.S.C. § 2517(5) in connection with the government's use of wiretap evidence in grand jury proceedings;

4. To the extent Count Five is not dismissed, to sever the § 1960 charge from the tax offenses charged in Counts One through Four pursuant to Rule 8(a);

5. To compel the production of information and evidence, pursuant to *Brady v. Maryland* and Rule 16(a)(1)(E)(i), relating to entrapment and due process issues concerning investigative techniques; and

6. To require the government to produce 90 days prior to trial designations relating to any recordings that survive these motions, along with final versions of the corresponding transcripts and translations, which the government intends to offer in its case-in-chief at trial.

(Mot. at 4.) The Government opposes all of Defendant's requests, contending they are without merit. (Resp. in Opp'n at 7.) The Court addresses the parties' arguments according to the order above.

## I.    Whether Dismissal of Count Five of the Indictment is Warranted for Insufficiency

Defendant first argues that as alleged, Count Five of the Indictment stretches 18 U.S.C. § 1960 past its breaking point because he was neither operating a "money transmitting business" in connection with the four private exchanges of checks for cash with the named third party (*i.e.*, the CW), nor offering services "on behalf of the public." (Mot. at 8.) Alternatively, Defendant argues that insofar as Count Five satisfies the bare minimum under Federal Rule of Criminal Procedure 7, the statutory terms are ambiguous under the circumstances, as the IRS itself has as much acknowledged in publicly available guidance, for which the charge is still unsound under the rule of lenity and fair notice principles. (*Id.* at 8–9.)

In opposition, the Government contends that Count Five is sufficient under Second Circuit precedent because it tracks the language of the relevant criminal statutes, 18 U.S.C. §§ 371 and

1960(b). (Resp. in Opp'n at 21–23.) It further contends that, contrary to Plaintiff's argument, the evidence the Government will present at trial will meet the elements in § 1960 that he conspired to operate a money transmitting business based on the alleged transactions with the CW, and that he also had fair notice that he could be persecuted under that statute based on his conduct in this case. (*Id.* at 23–28.) After due consideration, the Court agrees with the Government.

    A.    *Standard*

There are "two constitutional requirements for an indictment: first, that it contains the elements of the offense charged and fairly informs a defendant of the charge against which he must defend, and, second, that it enables him to plead an acquittal or conviction in bar of future prosecutions for the same offense." *United States v. Resendiz-Ponce*, 549 U.S. 102, 108 (2007) (internal quotation mark omitted). "[A]n indictment need do little more than to track the language of the statute charged and state the time and place (in approximate terms) of the alleged crime." *United States v. Vilar*, 729 F.3d 62, 80 (2d Cir. 2013). Although the language of the statute may be used in the description of the offense, the description "must be accompanied with such a statement of the facts and circumstances as will inform the accused of the specific [offense], coming under the general description, with which he is charged." *Hamling v. United States*, 418 U.S. 87, 117–18 (1974).

Under Federal Rule of Criminal Procedure 12(b)(3)(B), a Court may dismiss an indictment if it suffers from deficiencies enumerated therein. Proving a defect, however, is a laborious task because of the low sufficiency threshold requirement, which requires only that an indictment contain a "plain, concise, and definite written statement[s] of the essential facts constituting the offense[s] charged." Fed. R. Crim. P. 7(c)(1). "[C]ommon sense and reason prevail over technicalities." *United States v. Sabbeth*, 262 F.3d 207, 218 (2d Cir. 2001); *see also Resendiz-Ponce*, 549 U.S. 102, 107 (2007) ("While detailed allegations might well have been required under

common-law pleading rules, they surely are not contemplated by Rule 7(c)(1), which provides that an indictment 'shall be a plain, concise, and definite written statement of the essential facts constituting the offense charged.'" (quoting Fed. R. Crim. P. 7(c)(1)) (citation omitted)).

Moreover, "[i]t is well settled that in an indictment for conspiring to commit an offense—in which the conspiracy is the gist of the crime—it is not necessary to allege with technical precision all the elements essential to the commission of the offense which is the object of the conspiracy." *United States v. Wydermyer*, 51 F.3d 319, 325 (2d Cir. 1995); *see also United States v. LaSpina*, 299 F.3d 165, 177 (2d Cir. 2002). "The rationale is that the crime of conspiracy is complete whether or not the substantive offense which was its object was committed." *Wydermyer*, 51 F.3d at 325.

The Second Circuit has "repeatedly refused, in the absence of any showing of prejudice, to dismiss charges for lack of specificity." *United States v. Walsh*, 194 F.3d 37, 45 (2d Cir. 1999); *accord United States v. Stringer*, 730 F.3d 120, 125 (2d Cir. 2013). Indeed, the Second Circuit has "consistently upheld indictments that 'do little more than to track the language of the statute charged and state the time and place (in approximate terms) of the alleged crime.'" *Walsh*, 194 F.3d at 44 (citing *United States v. Tramunti*, 513 F.2d 1087, 1113 (2d Cir. 1975)). Accordingly, an indictment need only address the "core of criminality" of an offense, meaning, the essence of a crime in general terms, and not the particulars of how a defendant effectuated the crime. *United States v. D'Amelio*, 683 F.3d 412, 418 (2d Cir. 2012).

In reviewing the sufficiency of an indictment, it is generally improper for the Court to consider evidentiary sufficiency or the merits of the case. *United States v. Alfonso*, 143 F.3d 772, 776–77 (2d Cir. 1998). "In other words, there is no 'summary judgment' equivalent to Rule 56 of the Federal Rules of Civil Procedure in criminal cases." *United States v. Cremer*, No. 12 Cr. 473

(KBF), 2012 WL 6681700, at *2 (S.D.N.Y. Dec. 13, 2012) (citing *Alfonso*, 143 F.3d at 776–77). "[A]lthough a judge may dismiss a civil complaint pretrial for insufficient evidence, a judge generally cannot do the same for a federal criminal indictment." *United States v. Sampson*, 898 F.3d 270, 280 (2d Cir. 2018). "[W]hen a defense raises a factual dispute that is inextricably intertwined with a defendant's potential culpability, a judge cannot resolve that dispute on a Rule 12(b) motion." *Id.* at 281. Finally, when considering a motion to dismiss, the Court must assume the truth of the factual allegations in an indictment. *See Boyce Motor Lines, Inc., v. United States*, 342 U.S. 337, 343 n.16 (1952); *accord United States v. Malka,* --- F. Supp. 3d ---, S319CR497(NSR)(05)(09), 2022 WL 1488568, at *32 (S.D.N.Y. May 11, 2022).

Here, Count Five alleges that Defendant conspired to operate an unlicensed money transmitting business (an offense under 18 U.S.C. § 1960), in violation of 18 U.S.C. § 371. Notably, while Defendant disputes Count Five's sufficiency based on the allegations related to the alleged illegal money transmitting business, he does not dispute its sufficiency based on the allegations related to the alleged conspiracy to do so. (*See* Mot. at 9–13.) Hence, the Court only determines whether Count Five's allegations relating to the alleged money transmitting business are sufficient under § 1960.

Section 1960 is "a general intent crime for which a defendant is liable if he knowingly operates an unlicensed money transmitting business." H.R. Rep. 107-205(I), at *54 (2001). It does not require proof that "the defendant knew that a State license was required or that the Federal registration requirements promulgated pursuant to 31 U.S.C. § 5330 applied to the business." *Id.* In 2001, Congress expanded "the definition of an unlicensed money transmitting business to include a business engaged in the transportation or transmission of funds that the defendant knows are derived from a criminal offense, or are intended to be used for an unlawful purpose." *Id.*

7

Section 1960 accordingly makes it a crime to "conduct[], control[], manage[], supervise[], direct[], or own[] all or part of an unlicensed money transmitting business." The section defines the term "unlicensed money transmitting business" in relevant part as:

> a money transmitting business which affects interstate or foreign commerce in any manner or degree and—
>
> (A) is operated without an appropriate money transmitting license in a State where such operation is punishable as a misdemeanor or a felony under State law, whether or not the defendant knew that the operation was required to be licensed or that the operation was so punishable; [or]
>
> . . . .
>
> (C) otherwise involves the transportation or transmission of funds that are known to the defendant to have been derived from a criminal offense or are intended to be used to promote or support unlawful activity.

18 U.S.C. § 1960(b)(1). The statute additionally states that "the term 'money transmitting' includes transferring funds on behalf of the public by any and all means including but not limited to transfers within this country or to locations abroad by wire, check, draft, facsimile, or courier." *Id.* § 1960(b)(2).

### B.   Application

With that in mind, the Court concludes that Count Five is sufficient. First, Count Five's allegations track the language of the statute charged and state the time and place of the alleged crime. For example, the Government alleges that as part and object of the conspiracy, from at least September 2014 to August 2016, Defendant "did knowingly and willfully, conduct, control, manage, supervise, direct, and own all and part of an unlicensed money transmitting business affecting interstate and foreign commerce," by agreeing with others "to transmit approximately $6 million that he and others believed to be stolen, using real estate companies and charities under their control, which failed to comply with the money transmitting business registration requirements set forth in federal law and regulations . . . ." (Indictment ¶¶ 8–9.)

8

Further, Count Five also provides sufficient information to enable Defendant to prepare for his defense by providing three specific overt acts indicating how Defendant allegedly acted in accordance with the alleged conspiracy to operate an unlicensed money transmitting business. For example, the Government alleges that on multiple occasions, Defendant accepted cash amounts from the CW and gave him back a check for a similar amount minus a ten percent commission Defendant retained as fee "for laundering the cash." (*Id.* ¶ 10.)

Notwithstanding, Defendant argues that the Government did not adequately allege that he conspired to operate a "business" under § 1960 as it only alleges that he participated in four isolated transactions with the CW, which were not "regularly carried on" or part of a "commercial enterprise." (Mot. at. 9–10.) Defendant further argues that the Government did not adequately allege that he engaged in "money transmitting" because it did not allege that  he transferred funds "on behalf of the public," and instead, that he only exchanged cash for checks in a private setting with a single individual. (*Id.* at. 10–11.) Defendant moreover argues that the Government did not adequately allege that he engaged in "money transmitting" because it did not allege that he transmitted funds to another location or person, and instead, that he only engaged in a reverse form of check cashing. (*Id.* at. 10–11.)

But the Court is of the view that Defendant's arguments seem to challenge the merits of the Government's case and not necessarily the sufficiency of Count Five. Such challenge is "generally improper for the Court to consider," *Alfonso*, 143 F.3d at 776–77, and furthermore, at this stage, the Court must assume the truth of the factual allegations in the Indictment. *See Boyce Motor Lines, Inc.*, 342 U.S. at 343 n.16; *accord Malka,* 2022 WL 1488568, at *32.

Additionally, insofar as Defendant's arguments solely attack the sufficiency of Count Five, particularly with respect as to whether it fairly informs him of offense he is alleged to have

committed, the Government has already provided him with further details during discovery to aid him towards that effect. "While a bill of particulars or discovery cannot save a 'defective indictment,' . . . where the indictment has been found even minimally sufficient, a court may look to the record as a whole in determining whether the defendant is protected from double jeopardy in a subsequent prosecution and whether the defendant has had an adequate opportunity to prepare his defense." *Walsh*, 194 F.3d at 45 (citations omitted).

As discussed above, Count Five does "little more than to track the language of the statute charged and state the time and place (in approximate terms) of the alleged crime," *id.* at 44 (citing *Tramunti*, 513 F.2d at 1113, and addresses the "core of criminality" of an offense, *even* including some the particulars about how Defendant effectuated the crime, *D'Amelio*, 683 F.3d at 418. And when considering Defendant's own accompanying exhibits, which comprise of some of the discovery materials the Government produced (*see* Bove Aff. ¶ 2 ("Attached hereto as Exhibits A through U are true and correct copies of documents produced to [Defendant] during discovery."); Bove 2d Aff. ¶ 2 (same)), the Court determines that the information therein not only protects him from double jeopardy in a subsequent prosecution, but also provides him an adequate opportunity to prepare for his defense in this case.

First, Count Five does sufficiently allege that Defendant operated a "money transmitting *business*" under § 1960. In *United States v. Velastegui*, the Second Circuit held that "an agent could [not] face federal criminal prosecution [under § 1960] . . . for an isolated instance of improper transmittal of money" because "section 1960(a) requires that the unlicensed entity be 'an illegal money transmitting business.'" *Velastegui*, 199 F.3d at 595 n. 4. "Thus, to find a defendant liable for operating an unlicensed money transmitting business, a jury must find that he participated in

more than a 'single, isolated transmission of money.'" *United States v. Banki*, 685 F.3d 99, 113–14 (2d Cir. 2012), *as amended* (Feb. 22, 2012) (quoting *Velastegui*, 199 F.3d at 595 n. 4).

Hence, contrary to Defendant's argument, the allegations in Count Five alone are sufficient because the Government alleges that on multiple occasions, Defendant accepted cash amounts from the CW and gave him back a check for a similar amount minus a ten percent commission Defendant retained as fee "for laundering the cash." (Indictment ¶ 10.) In fact, the documents produced in discovery contain information also indicate that Defendant transmitted money for others—including Chaskel and Alter Landau, and a home builder—for years prior to the CW approaching him. (*See, e.g.*, Bove Aff. at 83 (noting that when the CW met with Chaskel and Alter Landau on November 5, 2014, Alter told the CW that Defendant "used to" conceal the source, nature, or control of illegal proceeds for the Landaus); *id.* at 83–84 (noting that on June 3, 2015, when the CW met with the Landaus and Defendant at Defendant's residence in Monsey, New York, Defendant described how he "had made such an 'accommodation' before for a "partner" with a "huge business").)

Second, as the Government correctly points out, there is no binding case—not even a non-binding one—adopting the requirement Defendant broadly construes to arise from the term "on behalf of the public" in § 1960. Indeed, the Second Circuit has affirmed convictions for defendants who provided money transmission services to a subset of the public. *See, e.g.*, *United States v. Altareb*, 758 F. App'x 116, 121 (2d Cir. 2018) (summary order) (unpublished) (denying a sufficiency of the evidence challenge where the defendant engaged in six transactions for two individuals); *Banki*, 685 F.3d at 114 (holding that a Hawala, a network for transmitting money among members of Islamic communities, qualified as a money transmitting business).

Other courts have similarly reasoned when overruling arguments such as the one Defendant presents here. *See, e.g.*, *United States v. $215,587.22 in U.S. Currency Seized from Bank Account No. 100606401387436 held in the Name of JJ Szlavik Companies, Inc. at Citizens Bank*, 306 F. Supp. 3d 213, 218 (D.D.C. 2018) ("[T]he Court does not read the "on behalf of the public" requirement to turn on the number of customers the money transmitter has. Rather, the most natural reading of the phrase is that the money transmissions must be made for third-parties or customers as part of a commercial or business relationship, instead of with one's own money or for family or personal acquaintances."); *United States v. Emilor, S.A.*, No. 6:07-CR-1, 2998 WL 2152279, at *12 (E.D. Tex. May 21, 2008) ("[T]he specific language of Section 1960(b) (2) states that 'the term 'money transmitting' includes transferring funds on behalf of the public . . . .' Through the use of 'includes,' the statutory intent of Section 1960(b)(2) is to bring the conduct expressed in this subsection within the meaning of 'money transmitting,' but not to limit its definition to the expressed conduct or to make the expressed conduct an essential element of the offense.").

Even when assuming Defendant's construction of the term "on behalf of the public" is correct, the documents produced in discovery contain information indicating that Defendant transmitted money for others other than the CW. (*See, e.g.*, Bove Aff. at 83 (noting that Defendant "used to" conceal the source, nature, or control of illegal proceeds for the Landaus); *id.* at 83–84 (noting that Defendant described how he "had made such an 'accommodation' before for a "partner" with a "huge business").)

And third, the Court is not persuaded by Defendant's argument that his conduct cannot constitute "transferring funds" under § 1960 as only a defendant who transmits funds from one location or person to another location or person can be considered to be doing so under the statute. First, to be sure, the Second Circuit mentioned in *dicta* that a money transmitting business

12

receives money from a customer and then, for a fee paid by the customer, transmits that money to a recipient in a place that the customer designates, usually a foreign country. After the customer gives the money transmitter an amount to send to the designee, the transmitter notifies the "payer" with whom it has a contractual arrangement in the recipient country. The payer then notifies the designated recipient of the money, and pays the money to the designee at the payer's office. The transmitter then remits to the payer the amount paid to the designee, plus the payer's commission.

*Velastegui*, 199 F.3d at 592. Additionally, Title 31 of the Code of Federal Regulations, Section 1010.100(ff)(5)(i)(A) defines the term "money transmission services" as "the acceptance of currency, funds, or other value that substitutes for currency *from one person* and the transmission of currency, funds, or other value that substitutes for currency *to another location or person* by any means." 31 C.F.R. § 1010.100(ff)(5)(i)(A) (emphasis added).

However, Title 13 of the United States Code, Section 5330(d)(1)(A)—which is referenced by 18 U.S.C. § 1960(b)(1)(B)—also defines a "money transmitting business" in part as

any business other than the United States Postal Service which . . . provides *cash checking*, currency exchange, or money transmitting or remittance services, or issues or redeems money orders, travelers' checks, and other similar instruments or any other person who engages as a business in the transmission of currency, funds, or value that substitutes for currency, including any person who engages as a business in an informal money transfer system or any network of people who engage as a business in facilitating the transfer of money domestically or internationally outside of the conventional financial institutions system . . . .

31 U.S.C. § 5330(d)(1)(A) (emphasis added). Hence, it stands to reason that even Defendant's own characterization of his own conduct as a "reverse form of check cashing" could constitute "transferring funds" under 18 U.S.C. § 1960.

Indeed, as Judge Rakoff noted in another case:

Section 1960 was passed as an anti-money laundering statute, designed "to prevent the movement of funds in connection with drug dealing." *United States v. Bah*, 574 F.3d 106, 112 (2d Cir. 2009) (citing H.R. Rep. No. 107–250(I), at 54 (2001)). Congress was concerned that drug dealers would turn increasingly to "nonbank financial institutions" to "convert street currency into monetary instruments" in order to transmit the proceeds of their drug sales. S. Rep. 101–460, 1990 WL

201710 (1990). Section 1960 was drafted to address this "gaping hole in the money laundering deterrence effort." *Id.* Indeed, it is likely that Congress designed the statute to keep pace with such evolving threats, which is precisely why it drafted the statute to apply to any business involved in transferring "funds . . . by any and all means." 18 U.S.C. § 1960(b)(2).

*United States v. Faiella*, 39 F. Supp. 3d 544, 545–46 (S.D.N.Y. 2014). Evidently, the Indictment here does not allege any drug dealing of any kind. Yet, the legislative history strongly suggests that § 1960 covers the conduct Defendant is alleged to have committed here: to act as an unregistered "nonbank financial institution" that "convert[s] street currency into monetary instruments" in order to transmit the proceeds derived from a criminal offense in an effort to launder them. *Id.*

But most notably, even when assuming without deciding that Defendant is correct, the Government correctly points out that Defendant's conduct as alleged nonetheless indicates that he transmitted funds from one location or person to another location or person. Specifically, Count Five alleges that Defendant "agreed with others to transmit approximately $6 million that he and the others believed to be stolen, using real estate companies and charities under their control" by "accept[ing]cash from" the CW and then "writ[ing] a check payable to an entity designated by the [CW], all in exchange for a fee of ten percent of the amount." (Indictment ¶¶ 9–10.) In fact, as the documents produced in discovery show, the alleged scheme involved Defendant first receiving money from the CW, then, for a fee paid, arranging for two real estate entities—InterGlobal Realty and Broadway Management—to transmit the money through checks to two shell companies of the CW's choosing—Mainsail and F.E.P. Tech. (*See* Bove Aff. at 84–86.) Thus, Defendant's conduct here still fall nonetheless within Defendant's own proffered definition of "transferring funds" under § 1960.

14

And lastly, for all the reasons discussed above, the Court concludes that Defendant had fair notice that he could be prosecuted based on his conduct here and that the rule of lenity is inapplicable.

"The Supreme Court has repeatedly stated that the rule of lenity is 'reserved . . . for those situations in which a reasonable doubt persists about a statute's intended scope even after resort to the language and structure, legislative history, and motivating policies of the statute.'" *Faiella*, 39 F. Supp. 3d at 546 (quoting *Moskal v. United States*, 498 U.S. 103, 108 (1990)); *see also Bifulco v. United States*, 447 U.S. 381, 387 (1980)); *United States v. Litchfield*, 986 F.2d 21 (2d Cir. 1993). It "comes into operation at the end of the process of construing what Congress has expressed, not at the beginning as an overriding consideration of being lenient to wrongdoers." *Callanan v. United States*, 364 U.S. 587, 596 (1961).

Here, the Court agrees with the Government that the statute clearly proscribes Defendant's conduct—transmitting money for profit without a license. Notably, as the documents produced in discovery show, Defendant himself seems to have acknowledged that his conduct was illegal. For example, throughout his interactions with the CW, Defendant referred to their money transactions as "non-kosher." (Bove Aff. at 86.) He also charged the CW a ten percent fee for his services because, in his own words, "it's a job." (*Id.* at 84.) And when the CW told Defendant, "God forbid they ever check into it ya know," Defendant did not respond with confusion or skepticism; instead, he simply replied, "All three of us. God forbid they ever check into this. There's problems. Nothing is fool proof." (*Id.* at 85.)

Accordingly, the Court denies Defendant's request to dismiss Count Five.

## II. Whether Evidence Must Be Suppressed for the Alleged Failure to Preserve Exculpatory Evidence

Defendant next argues that the CW's recordings must be suppressed because law

enforcement allegedly failed to preserve exculpatory evidence. (Mot. at 13–18.) Defendant claims that the investigation presented heightened entrapment concerns because of, in part, issues with the CW's reliability and candor, a cessation of contact between the CW and the investigative targets that lasted at least five months, and the apparent belief of law enforcement that the Government expected the agents to induce the targets beyond some of monetary "threshold" prior to bringing charges. (*Id.* at 13.) Defendant also claims that "it appears that the CW failed to record, or selectively recorded, meetings with the targets at crucial times during the investigation." (*Id.*)

In response, the Government contends that Defendant's argument fails because he does not assert that any exculpatory evidence was destroyed. (Resp. in Opp'n at 28–40.) The Government also contends that Defendant's argument is an untenable expansion of the destruction of evidence doctrine because if the Government fails to record *every* conversation with *every* target for the duration of the investigation, then the only appropriate remedy for Defendant is to suppress *every* recording in the investigation. (*Id.* at 34.) Further, the Government contends that Defendant fails to show how the CW made any selective recordings, much less that even if he did so, that he made them in bad faith. (*Id.* at 36–38.) Lastly, the Government contends that Defendant grossly mischaracterizes the record in arguing that law enforcement had concerns about potential entrapment and the CW's reliability. (*Id.* at 34–40.) After due consideration, the Court agrees with the Government.

A.   Standard

Destruction of evidence by the government rises to a constitutional violation when three requirements are met: (1) the government must have acted in bad faith in failing to preserve or destroying the evidence, *Arizona v. Youngblood*, 488 U.S. 51, 56–58 (1988); (2) the "evidence must possess an exculpatory value that was apparent before it was destroyed," *California v. Trombetta*, 467 U.S. 479, 484 (1984); and (3) the defendant must be "unable to obtain comparable

evidence by other reasonably available means," *id.* at 479–80.

   *Youngblood* is consistent with the Second Circuit's well-established rule, prior to *Youngblood*, that to find such a constitutional violation requires an analysis of a variety of case-specific factors, including "the government's culpability for the loss . . . a realistic appraisal of its significance when viewed in light of its nature, its bearing upon critical issues in the case and the strength of the government's untainted proof." *United States v. Grammatikos*, 633 F.2d 1013, 1020 (2d Cir. 1980); *accord United States v. Morgenstern*, 933 F.2d 1108, 1115-16 (2d Cir. 1991) (loss of evidence through "unthinking negligence of gross magnitude"—loaning materials to complaining witnesses—did not substantially prejudice defense and, therefore, no government sanctions were warranted); *United States v. Maldonado-Rivera*, 922 F.2d 934, 954–55 (2d Cir. 1990) (sanctions inappropriate when loss was inadvertent and materials available in other forms); *United States v. Rastelli*, 870 F.2d 822, 833–34 (2d Cir. 1989*)* (no prejudice found and sanctions unwarranted when government lost "potentially useful" tapes of three conversations through negligence, not bad faith).

   *Youngblood* underscored the requirement of finding bad faith on the part of the Government to find a constitutional violation. In that case, the lower court had reversed the defendant's conviction because the police conduct led to the destruction of forensic evidence that, if tested, may have exonerated the defendant. *See Youngblood*, 488 U.S. at 55. However, the lower court did not assign bad faith to the police officers at fault. *See id.* The Supreme Court, in reversing the decision and affirming the defendant's conviction, reviewed the jurisprudence surrounding the "area of constitutionally guaranteed access to evidence." *Id.* (quoting *United States v. Valenzuela-Bernal*, 458 U.S. 858, 867 (1982)). The Supreme Court observed:

> Our decisions in related areas have stressed the importance for constitutional purposes of good or bad faith on the part of the Government when the claim is

> based on loss of evidence attributable to the Government. In *United States v.*
> *Marion*, 404 U.S. 307 (1971), we said that "[n]o actual prejudice to the conduct of
> the defense is alleged or proved, and there is no showing that the Government
> intentionally delayed to gain some tactical advantage over appellees or to harass
> them." *Id.*, at 325; *see also United States v. Lovasco*, 431 U.S. 783, 790 (1977).
> Similarly, in . . . *Valenzuela-Bernal*, [458 U.S. 858 (1982)], we considered whether
> the Government's deportation of two witnesses who were illegal aliens violated due
> process. We held that the prompt deportation of the witnesses was justified "upon
> the Executive's good faith determination that they possess no evidence favorable
> to the defendant in a criminal prosecution." *Id.* at 872.

*Id.* at 57 (citations omitted). *See also Illinois v. Fisher*, 540 U.S. 544, 548 (2004) (per curiam)
(emphasizing *Youngblood's* holding requiring showing of bad faith and noting that Court has
"never held or suggested that the existence of a pending discovery request eliminates the necessity
of showing bad faith on the part of police"). By contrast, where the government acts in bad faith,
the conduct of the government in itself "indicate[s] the evidence could form a basis for exonerating
the defendant" and the interests of justice require sanctions sufficient to protect both the accused
and the integrity of the criminal justice system. *See Youngblood*, 488 U.S. at 58.

Thus, the holding in *Youngblood*, its predecessor decisions, and its progeny make clear that
a court must find bad faith, or intentional misconduct, on the part of the government to find a
constitutional violation and to impose sanctions. *See also Trombetta*, 467 U.S. at 488 (noting that
the record contained "no allegation of official animus towards respondents or of a conscious effort
to suppress exculpatory evidence" in determining that the violation was not of a constitutional
dimension warranting sanctions).

Bureaucratic error alone is not a sufficient basis to infer bad faith on the part of the
Government in its destruction of potentially exculpatory evidence. *See United States v. Hunley*,
476 F. App'x 897, 898 (2d Cir. 2012) (summary order) (unpublished); *Youngblood*, 488 U.S. at
55 (lab technician failing to refrigerate, and thereby failing to preserve, semen samples from a
sexual assault victim's clothing that "might have completely exonerated [the defendant]" not

indicative of bad faith); *see also United States v. Tyree,* 279 F. App'x 31, 33 (2d Cir. 2008) (summary order) (unpublished) (no bad faith where evidence destroyed because of a "gap in the bureaucratic network"); *Hernandez v. Burge*, 137 F. App'x 411, 414 (2d Cir. 2005) (no bad faith where defendant failed to produce evidence showing destruction of evidence was "purposeful").

By the same token, the Government is not required to use any particular investigative technique in preparing its case. *See, e.g.*, *United States v. Zapata*, 164 F.3d 620 (2d Cir. 1998) (table decision). Indeed, the Second Circuit has rejected the contention that *Brady* or the Confrontation Clause requires the Government to even take notes during witness interviews. *See United States v. Rodriguez*, 496 F.3d 221, 224 (2d Cir. 2007). Instead, the Government's sole obligation is to "inform the accused of information that materially impeaches its witness." *Id.* at 225.

B.    *Application*

As a preliminary matter, the Court notes that destruction of evidence doctrine does not neatly apply here as Defendant argues. That is because "that is not what [Defendant argues] happened here. [The] [r]ecordings are not 'missing' because the confidential sources or anyone else destroyed them, but rather because they were never made." *United States v. Campo Flores*, S5 15 CR. 765 (PAC), 2016 WL 5946472, at *3 (S.D.N.Y. Oct. 12, 2016). But "[t]he Government is not obligated to record every interaction between a confidential source and a suspect." *Id.* (citing *United States v. Chaudhry*, 850 F.2d 851 857 (1st Cir. 1988) ("We see no basis for the imposition, by judicial fiat as it were, of an 'all-or-nothing' rule, requiring officers to record all conversations (heedless of risk, opportunity, or likely fruitlessness) or none, with no middle ground."); *United States v. Feekes*, 879 F.2d 1562, 1564 (7th Cir. 1989)).

Defendant also provides no legal authority supporting his position that the Government's failure to record a conversation amounts to either a willful destruction of evidence or a failure to

preserve evidence. *See, e.g.*, *United States v. Nunez*, 89 CR. 730 (RPP), 1990 WL 29430, at *2 (S.D.N.Y. Mar. 13, 1990) ("[The] defendant fails to state any basis for his claim that the government's failure to tape record the conversation amounts to a willful destruction of evidence, rather than simply a decision not to create a certain type of evidence."). "Nor is there any basis [here] for asserting that the [G]overnment has violated its obligation to produce exculpatory evidence." *Id.*

But perhaps most importantly, while Defendant proffers multiple alleged occasions during which the CW—assuming of course, that his alleged conduct is attributable to the Government[1]— failed to record purportedly relevant conversations, he still fails to indicate (or even suggest) what kind of evidence possessing "an exculpatory value that was apparent," if any, existed in these conversations that could have supported a theory of entrapment. Instead, at most, all that Defendant suggests is that there was a *potential* for the existence of such evidence merely because the CW was acting under the direction of law enforcement. (*See, e.g.*, Mot. at 15 ("After recording a meeting at the direction of law enforcement in April 2014, the CW traveled to Hungary in May 2014, apparently while on pretrial release, and met with the Landaus. These early contacts between the CW and the Landaus support inducement arguments and an entrapment defense, but the CW did not record the meetings.").)

Notwithstanding, Defendant argues that the Court should conduct an evidentiary hearing "to address factual disputes, determine culpability and prejudice, and craft appropriate remedies." (Mot. at 18.) Defendant appears to aver that the factual disputes here include the CW's candor and alleged "selective recording," as well as law enforcement's alleged manifest entrapment concerns

---

[1]  *See DiBlasio v. City of New York*, 102 F.3d 654, 659–60 (2d Cir. 1996) (Jacobs, J., concurring) (noting that an informant's machinations cannot always be imputed to the police); *Labensky v. Cnty. of Nassau*, 6 F. Supp. 2d 161, 176 (E.D.N.Y. 1998), *aff'd sub nom. Labensky v. Rozzi*, 173 F.3d 845 (2d Cir. 1999).

with their investigative techniques. (*Id.* at 13.) But as the Government points out, Defendant fails to submit any affidavit from himself or the Landaus "setting forth the content of any conversations that were 'selectively' recorded" (Resp. in Opp'n at 36), or even of those that were unrecorded. *See, e.g.*, *United States v. Noble*, No. 07 Crim. 284(RJS), 2008 WL 140966, at *1 (S.D.N.Y. Jan. 11, 2008) ("In order to make the requisite showing [of relevant contested issues of fact] in sufficient detail, the defendant must submit an affidavit by someone with personal knowledge that disputed facts exist."); *United States v. Dewar*, 489 F. Supp. 2d 351, 359 (S.D.N.Y. 2007) ("In the absence of such an affidavit, or when the allegations contained in such an affidavit are general and conclusory, an evidentiary hearing is unnecessary."); *see also United States v. Barrios*, 210 F.3d 355 (2d Cir. 2000) (table decision) (unpublished) (no evidentiary hearing required on motion to suppress in the absence of "an affidavit of someone alleging personal knowledge of the relevant facts"); *United States v. Del Rosario*, No. 12 Crim. 81(KBF), 2012 WL 1710923, at *2 (S.D.N.Y. May 11, 2012) ("[C]ourts have repeatedly stated that defendants must present a sworn affidavit from a person with knowledge of the underlying facts—and that in the absence of such an affidavit an[ ] evidentiary hearing is unnecessary.").

Moreover, Defendant's attempts to controvert the CW's reliability and candor, as well as to raise issue law enforcement's alleged manifest entrapment concerns with their investigative techniques, are insufficiently "definite, specific, detailed, and nonconjectural as to indicate relevant contested issues of fact." *United States v. Ciriaco*, 121 F. App'x 907, 909 (2d Cir. 2005) (citing *United States v. Pena*, 961 F.2d 333, 339 (2d Cir. 1992)).

First, as the Government indicates, the wiretap application on which Defendant relies to aver that the CW's reliability and candor is at issue only notes that "[t]he CW was initially reluctant to discuss certain aspects of [his] personal use of cash tied to the tax evasion and mail fraud *with*

*which [he] is charged*. The CW ha[d] since, however, more freely discussed [his] involvement in those offenses as well as the involvement of others." (Bove Aff. at 14 ¶ 3 (emphasis added).) In fact, in that same paragraph, the affiant affirmed immediately after that throughout his conversations with the CW, "the CW ha[d] repeatedly provided information that [he] and other law enforcement officers *have been able to corroborate, including . . . information concerning this investigation*" and that he believed that "the information the CW ha[d] provided during the course of this investigation is *reliable*." (*Id.* (emphasis added).)

And second, contrary to Defendant's characterization of a report that purportedly raised entrapment concerns in law enforcement's investigative techniques, all that the report states that there was a delay in the investigation between November 2014 and June 2015 "due in part to investigative and administrative delays, and in part due to the CW and Target Subjects' travel schedules"—not because of perceived entrapment concerns. (*Id.* at 22 n.6.) Indeed, in a request for authority to conduct the investigation, dated June 16, 2015, law enforcement expressly noted that "[t]he USAO did not foresee any issues with entrapment." (*Id.* at 51.)

To be sure, at trial, Defendant may not only cross-examine the CW regarding his involvement in the investigation and impeach his credibility with adequate foundation; he may also assert an entrapment defense if he proffers legally sufficient evidence in support of such a defense. *See United States v. Williams*, 389 F.3d 402, 404 (2d Cir. 2004). Yet, Defendant's arguments here fail to establish the need for an evidentiary hearing—much less, that suppressing the CW's recordings based on the Government's alleged failure to record all purportedly conversations is warranted.

Accordingly, the Court denies Defendant's request to suppress evidence based on the Government's alleged failure to preserve evidence.

### III. Whether Evidence Must Be Suppressed for Lack of Probable Cause and Failure to Minimize Collection of Privileged and Non-Pertinent Calls; Whether Dismissal of Count Five is Warranted Based on the Alleged Use of Illegal Wiretaps during the Grand Jury

Defendant next seeks to suppress law enforcement's wiretaps of Chaskel Landau's phone for lack of probable cause and the Government's alleged failure to minimize collection of privileged and non-pertinent calls. (Mot. at 18–27.) Defendant also seeks to dismiss Count Five once again because the Government "likely" used wiretap evidence from Chaskel Landau's phone in the Grand Jury in violation of 18 U.S.C. § 2517(5). (*Id.* at 27–28.)

But the Court agrees with the Government that Defendant fails to establish that he has standing to challenge the wiretaps of another person's phone. (Resp. in Opp'n at 40.) In his motion, Defendant limits his discussion establishing his purported standing to a single sentence contained in a footnote, arguing in a conclusory manner that he is an "aggrieved person" with standing to challenge the alleged illegal wiretap because his communications were intercepted during the wiretaps to Chaskel Landau's phone. (*See* Mot. at 18 n. 5 (citing 18 U.S.C. § 2518(10)(a)).) Moreover,  even when assuming that Defendant had standing to challenge the wiretaps on Chaskel Landau's phone, the Government asserts in its opposition papers that it already informed Defendant's counsel two years ago that it did not intend to introduce recordings at trial. (Resp. in Opp'n at 40.) Therefore, Defendant's request to suppress the wiretaps from Chaskel Landau's phone are moot. *See United States  v. Henry*, 861 F. Supp. 1190, 1203 (S.D.N.Y. 1994).

Additionally, as the Government represents that the wiretaps from Chaskel Landau's phone were not used in the Grand Jury (*see* Resp. in Opp'n at 27), the Court denies Defendant's request to dismiss Count Five based on the Government's alleged violation of 18 U.S.C. § 2517(5).

### IV. Whether Count Five Must Be Severed from Counts One Through Four

Defendant next seeks to sever Counts One through Four, which charge him with filing false tax returns and with failing to file tax returns, from Count Five, which charges him with engaging in a money transmitting business to facilitate tax evasion. (Mot. at 28–30.) He argues that Count Five is distinct from Counts One through Four because: (1) there is no temporal overlap; and (2) the charges are not based on a common nucleus of facts. (*Id.*)

But the Government contends that all counts are of the "same or similar character" because they allege two schemes that have the same ultimate object—"to defraud the IRS of tax dollars"—and that Defendant used the same means and methods to perpetrate them—namely, creating phony loan arrangements and using two real estate companies, Inter Global Realty and Broadway Management, to facilitate the offenses. (Resp. in Opp'n at 42–48.) After due consideration, the Court agrees with the Government.

#### A.    Standard

The Federal Rules of Criminal Procedure allow for the joinder, in one indictment, of two or more offenses that are (1) "of the same or similar character"; (2) "based on the same act or transaction"; *or* (3) "are connected with or constitute parts of a common scheme or plan." Fed. R. Crim. P. 8(a); *see also United States v. Stewart*, 433 F.3d 273, 314 (2d Cir. 2006) (joined offenses may be "unified by some substantial identity of facts or participants, or arise out of a common plan or scheme") (internal quotation marks omitted). Each of these tests for when offenses may be tried together reflects a policy determination that gains in trial efficiency outweigh the recognized prejudice that accrues to the accused. *See United States v. Turoff*, 853 F.2d 1037, 1042 (2d Cir. 1988).

In reviewing the propriety of joinder, courts "apply a commonsense rule to decide whether, in light of the factual overlap among charges, joint proceedings would produce sufficient

efficiencies such that joinder is proper notwithstanding the possibility of prejudice to . . . the defendant[ ] resulting from the joinder." *United States v. Shellef*, 507 F.3d 82, 98 (2d Cir.2007) (internal quotation marks omitted). "[C]ounts might be 'connected' if one of the offenses 'depends upon or necessarily leads to the commission of the other,' or if proof of one act 'constitutes or depends upon proof of the other.'" *Id.* (quoting *United States v. Halper*, 590 F.2d 422, 429 (2d Cir.1978)) (internal stylistic changes omitted).

     *B.*    *Application*

     Here, the Court concludes that, while Defendant's alleged conduct in Count Five is "not based on the same act or transaction" as the ones in Counts One through Four, his alleged conduct in all counts are "of the same or similar character" *and* "are connected with or constitute parts of a common scheme or plan."

     First, the Court agrees with the Government that Defendant's alleged tax offenses in Counts One through Four share some connection with the alleged money transmitting scheme in Count Five. Notably, the Government represents in its briefing that it will present evidence at trial establishing that Defendant allegedly sought to conceal the money transmitting scheme by filing a false tax return in 2017 in which he claimed the transactions with the CW were "loans." (Resp. in Opp'n at 16, 43–44, 46.) Further, the Government claims that Defendant used the same two real estate companies (*i.e.*, Broadway Management and Inter-Global Realty) he used in the money transmitting scheme in Count Five for his tax evasion scheme. (*Id.* at 8–9, 13–15, 46.)

     Thus, Count Five and Count Two (which charges Defendant with aiding and assisting in the preparation of a false and fraudulent individual income tax return for tax year 2016) are connected because "one of the offenses 'depends upon or necessarily leads to the commission of the other,' or . . . proof of one act 'constitutes or depends upon proof of the other.'" *Shellef*, 507 F.3d at  98 (quoting *Halper*, 590 F.2d at 429 (internal stylistic changes omitted)). And since

Defendant does not dispute whether Count Two's joinder with Counts One, Three, and Four, then it stands to reason that trying all counts in the Indictment together would result in improved trial efficiency than if the Court were to sever Counts Two and Five from the remaining counts. *See Turoff*, 853 F.2d at 1042.

And second, as Defendant is seeking to present an entrapment defense against Count Five, the Government correctly asserts that evidence of Defendant's alleged predisposition from Counts One through Four is admissible under Federal Rule of Evidence 404(b) to negate such defense. (Resp. in Opp'n at 44 (quoting *United States v. Baez*, 761 F. App'x 23, 25 (2d Cir. 2019) (summary order) (unpublished).)

"If a defendant presents credible evidence of government inducement, then the prosecutor must show predisposition beyond a reasonable doubt." *United States v. Bala*, 236 F.3d 87, 94 (2d Cir. 2000). Rule 404(b) provides that evidence of crimes, wrongs, or other acts is inadmissible "to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character," but is admissible for other purposes. Fed. R. Evid. 404(b). "Under the inclusionary approach adopted by this Circuit, such evidence is admissible 'for any purpose other than to show the defendant's criminal propensity.'" *Baez*, 761 F. App'x at 25 (quoting *United States v. McCallum*, 584 F.3d 471, 475 (2d Cir. 2009)). "In an entrapment case, evidence offered to show predisposition is admissible under Rule 404(b)." *Id.* (citing *United States v. Blankenship*, 775 F.2d 735, 739 (6th Cir. 1985)). A district court must also assess the admissibility of such evidence under Rule 403, which permits a court to "exclude relevant evidence if its probative value is substantially outweighed by a danger of . . . unfair prejudice." Fed. R. Evid. 403.

It is not necessary for predisposition evidence to "be precisely the same as that for which the defendant is being prosecuted." *Baez*, 761 F. App'x at 25 (quoting *United States v. Harvey*,

991 F.2d 981, 994 (2d Cir. 1993) (internal quotation marks omitted)). Instead, when a defendant's past conduct is offered as predisposition evidence, the past conduct need only "be near enough in kind to support an inference that his purpose included offenses of the sort charged." *Id.* In other words, "prior acts evidence admitted under Rule 404(b) does not have to comprise precisely the same act at issue in the crimes charged if there is 'some connection' between the reason for introducing the prior act and the nature of the crimes charged." *United States v. Brand*, 467 F.3d 179, 207 (2d Cir. 2006), *abrogated on other grounds by United States v. Cabrera*, 13 F.4th 140 (2d Cir. 2021). This is true regardless of whether the defendant's other bad acts took place after the conduct for which he asserts he was entrapped. *See Baez*, 761 F. App'x at 26 ("[T]he Government may introduce post-inducement conduct to establish predisposition by demonstrating that the defendant 'promptly avail[ed] himself of a government-sponsored opportunity to commit a crime'" (quoting *Brand*, 467 F.3d at 193–95)).

Here, Counts One through Four require the Government to prove at trial that Defendant willfully filed tax returns and willfully failed to file tax returns—that is, that Defendant's alleged false statements and omissions in the filed tax returns and his decision not to file tax returns for the other years were not the result of misunderstandings and mistakes. *See, e.g.*, *United States v. Cadet*, 664 F.3d 27, 33 (2d Cir. 2011) (noting that willfulness is an element of the charge of filing false returns). In its briefing, with respect to Counts One through Four, the Government represents that it will present evidence at trial establishing that Defendant: (1) used Broadway Management and Inter-Global Realty to hide his personal income under the guise of business revenue to conceal the payments on his personal tax returns; and (2) falsely reported on his personal income tax returns that numerous payments he received were "loans" when in fact they were payments for services rendered. (*See* Resp. in Opp'n at 8.)

As noted above, the Government represents that it will also present evidence at trial establishing Defendant used these two real estate companies and substantially the same means and methods, including the creation of phony loan arrangements, to perpetrate the alleged money transmitting scheme in Count Five. (*See id.* at 8–9, 13–16, 43–44, 46.) Hence, assuming without deciding that such evidence is otherwise admissible, Defendant's alleged conduct in Counts One through Four is probative of Defendant's "preparation, plan, . . . absence of mistake, or lack of accident" under Rule 404(b) for the Government to negate his anticipated entrapment defense for Count Five. *See, e.g.*, *United States v. Oskowitz*, 294 F. Supp. 2d 379, 381 (E.D.N.Y. 2003) (admitting under Rule 404(b) uncharged evidence that the defendant had assisted others in filing false tax returns); *United States v. Jacobs*, 194 F. Supp. 3d 216, 219 (E.D.N.Y. 2016), *aff'd*, 735 F. App'x 739 (2d Cir. 2018) (same); *see also United States v. Alcantara*, 674 F. App'x 27, 30 (2d Cir. 2016)  (summary order) (unpublished) (approving admission of a prior conviction under 404(b) to show knowledge and intent where the prior conviction and charged offense "both involved the theft of Puerto Rican residents' identities to generate fraudulent tax refunds; [and] both involved tax preparation businesses where [the defendant] worked").

And lastly, on that same basis, the Court concludes that Defendant fails to establish that joinder of the counts here will result in unfair prejudice. *See United States v. Page*, 657 F.3d 126, 129 (2d Cir. 2011) ("The defendant must show that unfair prejudice resulted from the joinder, not merely that he might have had a better chance for acquittal at a separate trial" (internal quotation marks omitted)). The Supreme Court has held that "unfair prejudice" in the criminal context refers to "the capacity of some concededly relevant evidence to lure the factfinder into declaring guilt on a ground different from proof specific to the offense charged." *Old Chief v. United States*, 519 U.S. 172, 180 (1997). As the Second Circuit previously noted,

joinder of offenses under the Rule 8(a) rubric of "same or similar character" has been upheld where evidence of the one offense would be admissible in a separate trial on the other offense as evidence of "other crimes, wrongs, or acts." In such circumstances, the reasoning goes, the defendant is not unfairly prejudiced by the joint trial of the offenses.

*Halper*, 590 F.2d at 431.

Accordingly, the Court denies Defendant's request to sever Count Five from Counts One through Four.

### V.  Defendant's Individual Discovery Requests

Defendant next asks the Court to compel the Government to produce a list of discovery requests he had previously asked Government to produce. (Mot. at 30.) Defendant argues the evidence in these requests purportedly relates to entrapment issues, including inducement by law enforcement and Defendant's lack of predisposition, which is exculpatory and subject to the Government's obligations under *Brady v. Maryland*, 373 U.S. 83 (1963). (*Id.*) He argues that the evidence in these requests also purportedly relate to the conduct of the investigation and evidence-handling issues during the course of that investigation under Federal Rule of Criminal Procedure 16, which could support pretrial motions based on spoliation, entrapment as a matter of law, due process principles, and outrageous government conduct. (*Id.*)

In its response, the Government responded individually to each Defendant's discovery requests, representing in some that it had already produced the requested evidence, and in others that it will produce the requested evidence in due course based on the Court's deadlines for disclosure before trial. (*See* Resp. in Opp'n at 48–51.) With the benefit of the Government's response, in his reply, Defendant only takes issue with the following requests: 1, 4, 5, 6, 7, 9, and 13. (Reply at 19–21.) Accordingly, the Court only address the parties' arguments regarding these "outstanding" requests in that order.

*A.      Standard*

"Rule 16 of the Federal Rules of Criminal Procedure governs pre-trial discovery in criminal cases." *United States v. Delacruz*, No. 14 CR 815(KBF), 2015 WL 2211943, at *1 (S.D.N.Y. May 12, 2015) (citing *In re Terrorist Bombings of U.S. Embassies in E. Africa*, 552 F.3d 93, 124 (2d Cir. 2008) (citations omitted)). The rule provides, in pertinent part, that a defendant is entitled to obtain from the Government documents and objects that are "within the government's possession, custody, or control" if they are "material to preparing the defense" or will be used by the Government in its case-in-chief at trial. *Id.* at *1 (citing Fed. R. Crim. P. 16).

Evidence that the Government does not intend to use in its case-in-chief at trial is material "if it could be used to counter the government's case or to bolster a defense; information not meeting either of those criteria is not to be deemed material within the meaning of the Rule." *United States v. Stevens*, 985 F.2d 1175, 1180 (2d Cir. 1993). "Rule 16(a) is not and never was [ ] 'intended to provide the defendant with access to the entirety of the government's case against him.'" *Delacruz*, 2015 WL 2211943, at *1 (quoting *United States v. Percevault*, 490 F.2d 126, 130 (2d Cir. 1974) (citation omitted)).

Indeed, "[d]iscovery of evidence in criminal prosecutions is, inevitably, more restricted than discovery in civil cases." *United States v. Tolliver*, 569 F.2d 724, 728 (2d Cir. 1978). Rule 16 "does not entitle a criminal defendant to a 'broad and blind fishing expedition among [items] possessed by the Government on the chance that something impeaching might turn up.'" *United States v. Larranga Lopez*, No. 05 Cr. 655(SLT), 2006 WL 1307963, at *8 (E.D.N.Y. May 11, 2006) (alteration in original) (citing *Jencks v. United States*, 353 U.S. 657, 667 (1957) (quoting *Gordon v. United States*, 344 U.S. 414, 419 (1953))).

Further, "[t]here is no general constitutional right to discovery in a criminal case, and *Brady* did not create one." *Weatherford v. Bursey*, 429 U.S. 545, 559 (1977); *see also Pennsylvania v.*

*Ritchie*, 480 U.S. 39, 59 (1987) ("Defense counsel has no constitutional right to conduct his own search of the State's files to argue relevance." (citation omitted)); *United States v. Evanchik*, 413 F.2d 950, 953 (2d Cir. 1969) ("Neither [*Brady*] nor any other case requires the government to afford a criminal defendant a general right of discovery."); *United State v. Meregildo*, 920 F. Supp. 2d 434, 440 (S.D.N.Y.2013) ("*Brady* is not a rule of discovery—it is a remedial rule." (citing *United States v. Coppa*, 267 F.3d 132, 140 (2d Cir. 2001))). "Rather, *Brady* established that the Government has a constitutional obligation to disclose favorable and material information to the defendant." *Delacruz*, 2015 WL 2211943, at *2.

      *B.     Application*

         1.    <u>Request 1</u>

Defendant's first request involves all materials concerning the FBI's belief in 2015 about a "prosecutable threshold" for the investigation. (Mot. at 31 (citing Bove Aff. at 52 ("[T]he recoverable funds will need to be repeatedly laundered in order to reach a prosecutable threshold requested by the United States Attorney's Office, New York."))).) He argues that any "[e]vidence and communications relating to this 'threshold' support entrapment-related arguments at trial and any sentencing, and should be collected and promptly disclosed." (*Id.*)

The Government responds that it has already notified defense counsel that "it has no further materials in its possession relating to this issue" and that "[t]here is no FBI 'threshold' for sting operations other than the commonsense proposition that law enforcement does not prosecute individuals for petty offenses." (Resp. in Opp'n at 48.) The Government further contends that "even if some threshold existed—which it does not—it would not constitute *Brady* evidence in support of an entrapment defense" because predisposition focuses on whether the defendant "was ready and willing without persuasion to commit the crime charged and awaiting any propitious opportunity to do so." (*Id.* (citing *Bala*, 236 F.3d at 94).)

In his reply, Defendant takes issue with the fact that the Government did not expressly represent that it "conferred with the investigative agents" as to how they reached that conclusion that a "threshold" existed. (Reply at 19–20.) Defendant argues that any evidence bearing on inducement, including communications relating to this "threshold," is subject to disclosure. (*Id.* at 20.)

As a preliminary matter, the Court notes that Defendant does not present any facts suggesting that the Government's representations that it has failed to disclose any materials regarding the purported "prosecutable threshold" are either inaccurate or false. Therefore, the Court accepts the Government's representation given that there is no need for the Court to issue an order or to hold a hearing on this issue.

With that in mind, because Defendant has stated his intention to assert and entrapment defense, the Court interprets the Government's *Brady* obligation in this case to include any information in the possession of the Government that corroborates or supports (1) the Government's inducement or (2) Defendant's lack of predisposition. *See Bala*, 236 F.3d at 94 (noting that the entrapment defense has two elements that defendants must show by a preponderance of the evidence: "(1) government inducement of the crime, and (2) lack of predisposition on the defendant's part." (quoting *United States v. Salerno*, 66 F.3d 544, 547 (2d Cir. 1995)). The Court reminds the Government of its continuing *Brady* obligations, which includes the information described above.[2]

---

[2] To be abundantly clear, the parties shall not construe any language contained in the Court's ruling here to agree with Defendant's argument that the existence of a purported "prosecutable threshold," if any, supports "entrapment-related arguments at trial and any sentencing." The Court declines to rule on this issue at this time. Defendant may raise this issue in a future motion in *limine*.

2.      Requests 4, 7, and 13

Defendant's requests 4, 7, and 13 involve "any previously undisclosed evidence collected by the CW or any other confidential informants who participated in the investigation." (Mot. at 32–33.) The Government has previously informed Defendant's counsel that it had produced all recordings involving the CW in its possession, and that "it did not use any other informants to meet or record [him], Chaskel Landau, or Alter Landau." (Mot. at 33; Resp. in Opp'n at 49.)

But Defendant argues that his request is broader because he requests any recordings and electronic communications between other confidential sources and any investigative targets in a broader FBI investigation. (*Id.* at 33.) Specifically, Defendant argues that such evidence from this FBI investigation into public corruption and white-collar fraud involving a petition to transfer 510 acres of privately-owned land from the Town of Monroe to the Village of Kiryas Joel (the "Public Corruption Investigation") is subject to disclosure because it relates to the "prosecutable threshold" discussed earlier, and to potential information suggesting a lack of corruption of the investigation's other investigative targets. (*Id.*) Defendant became an investigative target after the Landaus introduced him to the CW. (*See, e.g.*, Resp. in Opp'n at 10–11.)

After due consideration, the Court concludes that Defendant fails to sufficiently establish any basis under which the Government must disclose such evidence to him. To start, Defendant neither expressly states whether the disclosure is required under Rule 16 nor the Government's *Brady* obligations. Additionally, insofar as Defendant argues that any recordings and electronic communications between other confidential sources and any investigative targets in the Public Corruption Investigation relate to his anticipated entrapment defense, the Court is unconvinced about how this evidence would be relevant to such defense. Indeed, none of the charges here against Defendant relate to public corruption or allege any connection with public officials.

33

Defendant also provides no argument explaining how public corruption charges against other investigative targets may relate to the instant charges against him.

In his briefing, Defendant seems to argue that exculpatory evidence *for his case* potentially exists based on the fact that the Government has not brought any charges against other investigative targets of the Public Corruption Investigation. Defendant appears to suggest that the Government chose not to prosecute these other investigative targets because the Government encountered either entrapment concerns or evidence indicating "a lack of corruption" in these targets. (*See* Mot. at 30.) In other words, it appears to the Court that (1) Defendant is speculating as to why the Government has yet to prosecute any investigative targets; and (2) if his speculations are correct, Defendant argues that recordings and electronic communications between other confidential sources and any investigative targets in the Public Corruption Investigation could *potentially* reveal that there were also entrapment concerns or evidence indicating "a lack of corruption" in his case.

But insofar as Defendant's request relies on Rule 16, this rule "does not entitle a criminal defendant to a 'broad and blind fishing expedition among [items] possessed by the Government on the chance that something impeaching might turn up.'" *Larranga Lopez*, 2006 WL 1307963, at *8 (alteration in original) (citing *Jencks*, 353 U.S. at 667 (quoting *Gordon*, 344 U.S. at 419)). Moreover, insofar as Defendant's request relies on the Government's *Brady* obligations, "[a]s a matter of law, mere speculation by a defendant that the government has not fulfilled its obligations under [*Brady*] is not enough to establish that the government has, in fact, failed to honor its discovery obligations." *United States v. Upton*, 856 F. Supp. 727, 746 (E.D.N.Y. 1994) (citing *United States v. Driver*, 798 F.2d 248, 250 (7th Cir. 1986)). "Speculation that further investigation might reveal additional exculpatory evidence is insufficient to support a finding of materiality."

34

*United States v. Muschette*, 392 F. Supp. 3d 282, 299 (E.D.N.Y. 2019) (citing *Wood v. Bartholomew*, 516 U.S. 1, 6–8 (1995)), *aff'd sub nom. United States v. Ramsey*, 20-860, 2021 WL 5022640 (2d Cir. Oct. 29, 2021).

Therefore, the Court finds no basis under which to compel the Government to disclose any of the information requested. Accordingly, the Court accepts the Government's representation that it has complied with these discovery requests and denies Defendant's request for any recordings and electronic communications between other confidential sources and any investigative targets in the Public Corruption Investigation.

### 3. Requests 5 and 6

Defendant's requests 5 and 6 involve evidence concerning law enforcement's instructions to the CW during the investigation. Defendant argues that these instructions are relevant to his entrapment arguments, and disclosure at this time is appropriate based on heightened concerns arising from the CW's failure to record a number of conversations, as discussed above. (Mot. at 33.)

The Government responds that it has "conferred with the investigative agents and confirmed that no instructions were provided to the CW in a recorded format." (Resp. in Opp'n at 49.) The Government notes, however, that "law enforcement would occasionally send text messages to the CW concerning when and where to meet." (*Id.* at 49 n.3.) In his reply, Defendant argues that the Government's response supports a finding that it has failed to preserve materials subject to *Brady* because they were relevant to the inducement. (Reply at 21.)

As already discussed above, "[t]he Government is not obligated to record every interaction between a confidential source and a suspect." *Campo Flores*, 2016 WL 5946472, at *3 (citing *Chaudhry*, 850 F.2d at 857; *Feekes*, 879 F.2d at 1564). Further, Defendant provides no legal authority supporting his position that the Government's failure to record a conversation amounts

to either a willful destruction of evidence or a failure to preserve evidence. *See, e.g.*, *Nunez*, 1990 WL 29430, at *2. "Nor is there any basis [here] for asserting that the [G]overnment has violated its obligation to produce exculpatory evidence." *Id.* As noted above, Defendant fails to indicate (or even suggest) what kind of evidence possessing "an exculpatory value that was apparent," if any, existed in these conversations that could have supported a theory of entrapment. *Id.* Again, at most, all that Defendant suggests is that there was a *potential* for the existence of such evidence merely because the CW was acting under the direction of law enforcement.

As to the text messages the Government references, in his reply, Defendant does not seem to specifically request the Court to compel the Government to produce them as discovery. He only avers that "[a]t minimum, the Court should inquire as to whether the [G]overnment has preserved and reviewed those messages."(Reply at 21.) Neither does the Government appear to specify whether it intends or not to disclose those text messages. (*See* Resp. in Opp'n at 49 n.3.)

Accordingly, absent further discussion between the parties with respect to these text messages, the Court accepts the Government's representation that it has complied with these discovery requests after conferring with the law enforcement agents involved.

### 4.   Request 9

Defendant's last request involves additional details regarding the FBI's "negative audit findings" concerning the handling of bank statements during the investigation. (Mot. at 34 (citing Boffe Aff. at 75).) Although the Government informed his counsel that "additional information regarding the audit was not possessed by the investigative team," Defendant argues that the Government has an obligation to search the FBI's holdings "beyond the confines of the current prosecution team in order to make further disclosures regarding the audit's findings and any related sanctions." (*Id.* at 34.)

36

The Government responds that Defendant fails to draw any connection between the audit and his anticipated entrapment defense because the "so-called 'negative audit' consists of a single paragraph in an otherwise unrelated report that '[t]here was one finding regarding bank statements not being reconciled in a timely manner for the months of July, August, and September." (Resp. in Opp'n at 50 (quoting Bove Aff. at 75).) The Government contends that "[t]he investigative team's failure to timely reconcile a few bank statements has zero relevance" to Defendant's anticipated entrapment defense. (*Id.*)

In his reply, Defendant argues that the connection is that "audit findings relating to problems with evidence handling during the investigation could bear on, for example, the agents' mental states in connection with the recording issues that are the subject" of his motion to suppress the CW's recordings for the Government's alleged failure to record certain conversations. (Reply at 21.)

After due consideration, the Court agrees with the Government that Defendant fails to establish any connection whatsoever between the supposed "negative audit" and his theory of entrapment. Defendant fails to indicate how this "negative audit" relates to either the "(1) [G]overnment['s] inducement of the crime, [or] (2) lack of predisposition on [his] part." *Bala*, 236 F.3d at 94 (quoting *Salerno*, 66 F.3d at 547). Further, because the Court already denied above Defendant's motion to suppress the CW's recordings based on the Government's alleged failure to record certain conversations, the Court is still unconvinced about how "the agents' mental states in connection with the recording issues" discussed above are at all relevant.

Therefore, the Court finds no basis under which to compel the Government to disclose any of the information requested. Accordingly, the Court accepts the Government's representation that

it has complied with this discovery request and denies Defendant's request for any information relevant to the purported "negative audit."

## VI. Defendant's Requests for Early Production of Trial Exhibits

Lastly, Defendant requests the Court to direct the Government to produce him with excerpts of recordings, their transcripts, and their translations from Yiddish into English, that it intends to offer in its case-in-chief 90 days before the trial date for him to "conduct an adequate defense investigation and prepare for trial." (Mot. at 35.) Specifically, Defendant argues that the requested deadline will allow him to retain audibility and language experts to contest the Government's transcriptions and translations, litigating completeness issues arising from the selected excerpts of the evidence, and preparing any required transcriptions and translations to be offered by the defense. (*Id.*)

The Government opposes the requested deadline because Defendant has been in possession of the transcripts and recordings for over two years and because he speaks Yiddish. (Resp. in Opp'n at 51.) The Government also avers that Defendant is already aware of which recordings are relevant because the Government has identified, quoted, and summarized them in its November 2019 complaint against him and in the briefing for the instant motion. (*Id.*) Additionally, in the event the Court imposes the requested deadline, the Government frequents the Court to impose a reciprocal burden on the defense to designate and produce any recordings, transcripts, and translations that Defendant intends to use 90 days before trial. (*Id.*) Nonetheless, the Government represents that it will confer with defense counsel in good faith and in a timely manner prior to trial to reach a mutual agreement on transcripts and translations. (*Id.*)

Based on the parties' representations, the Court concludes that there is no reason to impose the requested deadline here. Defendant also cites to no case holding otherwise. Here, "there is no reason to conclude that Defendant[] ha[s] not been able to prepare to meet any translations put

forward by the Government" because "Defendant[] [does] not suggest that [he] ha[s] not been in possession of any relevant [Yiddish]-language material for too little time or that [he] ha[s] been unable to adequately review the material[.]" *Campo Flores*, 2016 WL 5946472, at \*12. Neither has Defendant indicated whether there are any "audibility" issues in any specific recordings, and instead, only avers the potential for their existence generally.

Accordingly, the Court denies Defendant's request for early production of trial exhibits.

## CONCLUSION

For the foregoing reasons, the Court DENIES Defendant's motion in its entirety. The Clerk of Court is directed to terminate the motion at ECF No. 33.

Dated:  August 17, 2022
White Plains, NY

SO ORDERED:

_____
NELSON S. ROMÁN
United States District Judge